## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATHAN C. SILVA, Derivatively on Behalf of REGENERON PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> LEONARD S. SCHLEIFER, BONNIE L. BASSLER, MICHAEL S. BROWN, N. ANTHONY COLES, JOSEPH L. GOLDSTEIN, KATHRYN GUARINI, CHRISTINE A. POON, ARTHUR F. RYAN, DAVID P. SCHENKEIN, GEORGE L. SING, CRAIG B. THOMPSON, GEORGE D. YANCOPOULOS, HUDA Y. ZOGHBI, CHRISTOPHER FENIMORE, and ROBERT LANDRY, <br><br> Defendants, <br><br> and <br><br> REGENERON PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | Case No. 1:25-cv-00459 <br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Nathan C. Silva ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge

1

as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of a class action complaint filed in the Securities Class Action captioned *Radtke v. Regeneron Pharmaceuticals, Inc., et al.,* Case No. 1:25-cv-00145 (S.D.N.Y. Jan. 07, 2025); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Regeneron; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Regeneron against the Individual Defendants, certain of Regeneron's officers and directors, seeking to remedy their violations of federal law and breaches of fiduciary duty that have occurred from at least November 2, 2023 to October 31, 2024 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Regeneron and its shareholders.

2.     Regeneron is a biotechnology company that offers medical products designed for the treatment of, *inter alia,* eye disease, allergic and inflammatory diseases, cardiovascular disease, and cancer. One of the Company's core products is Eylea, an injection used to treat age-related macular degeneration.

3.     Eylea works by inhibiting anti-vascular endothelial growth factor ("anti-VEGF"). In November 2011, the FDA approved Eylea for use as an anti-VEGF inhibitor for age-related macular degeneration. In August 2023, the Company secured FDA approval for Eylea HD, a high-dose version of Eylea.

4.     Regeneron derives substantial revenue from its sales of Eylea and Eylea HD, which

2

are largely dependent on the availability of reimbursements from third-party payors like Medicare and Medicaid.

5.     The reimbursement rates for the Company's sales of Eylea and Eylea HD are based on the Average Sales Price ("ASP") that the Company reports to Centers for Medicare and Medicaid Services.

6.     On April 10, 2024, the U.S. Department of Justice ("DOJ") announced that it had filed a complaint against the Company for violations of the False Claims Act. Specifically, the DOJ alleged that the Company had been failing to report discounts that it was providing to distributors in its sales of Eylea and Eylea HD. As a result, the Company had been overbilling Medicare and Medicaid by overstating the ASP of Eylea and Eylea HD, in violation of the False Claims Act.

7.     On this news, the price of Regeneron stock declined 3.36% over the following two days, closing at $904.70 per share on April 12, 2024.

8.     The full truth emerged on October 31, 2024, when the Company reported disappointing third quarter 2024 financial results. Specifically, Regeneron reported that "[n]et product sales of EYLEA in the third quarter of 2024 were adversely impacted by a lower net selling price compared to the third quarter of 2023."

9.     On this news, the price of Regeneron stock declined 9.2% in one day, closing at $838.20 per share on October 31, 2024.

10.    As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

11.     Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, Regeneron maintains its principal executive offices in this District and is incorporated in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is, and has been at all relevant times, a shareholder of Regeneron.

### Nominal Defendant

19.     Nominal Defendant Regeneron is incorporated under the laws of New York, with its principal executive offices located in Tarrytown, New York. Regeneron common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "REGN."

### Individual Defendants

20.     Defendant Leonard S. Schleifer ("Schleifer") has served as a member of the Board since 1988 and has served as the Company's Chief Executive Officer ("CEO") at all relevant times. Defendant Schleifer has served as Co-Chair of the Board since June 2023. According to the Company's public filings, Defendant Schleifer received $8,184,338 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Schleifer beneficially owned 3,294,518 shares of Regeneron common stock, worth nearly $3 billion[1] and constituting 3% of the Company's total outstanding stock. Defendant Schleifer is named as a defendant in the Securities Class Action.

21.     Defendant Bonnie L. Bassler ("Bassler") has served as a member of the Board since 2016. According to the Company's public filings, Defendant Bassler received $709,987 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Bassler beneficially owned 19,248 shares of Regeneron common stock, worth more than $17 million.

22.     Defendant Michael S. Brown ("Brown") has served as a member of the Board since 1991. According to the Company's public filings, Defendant Brown received $728,987 in 2023 in

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are based on the $894.14 per share closing price of Regeneron stock on April 16, 2024.

compensation from the Company. As of April 16, 2024, Defendant Brown beneficially owned 17,825 shares of Regeneron common stock, worth nearly $16 million.

23.    Defendant N. Anthony Coles ("Coles") has served as a member of the Board since 2017 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Coles received $704,987 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Coles beneficially owned 6,674 shares of Regeneron common stock, worth nearly $6 million.

24.    Defendant Joseph L. Goldstein ("Goldstein") has served as a member of the Board since 1991. According to the Company's public filings, Defendant Goldstein received $709,987 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Goldstein beneficially owned 8,956 shares of Regeneron common stock, worth roughly $8 million.

25.    Defendant Kathryn Guarini ("Guarini") has served as a member of the Board since September 2023 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Guarini received $1,031,155 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Guarini beneficially owned 2,526 shares of Regeneron common stock, worth roughly $2.25 million.

26.    Defendant Christine A. Poon ("Poon") has served as a member of the Board since 2010. According to the Company's public filings, Defendant Poon received $748,009 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Poon beneficially owned 54,530 shares of Regeneron common stock, worth more than $48 million.

27.    Defendant Arthur F. Ryan ("Ryan") has served as a member of the Board since 2003 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Ryan received $724,987 in 2023 in compensation from the Company. As of April 16,

2024, Defendant Ryan beneficially owned 23,463 shares of Regeneron common stock, worth nearly $21 million.

28.      Defendant David P. Schenkein ("Schenkein") has served as a member of the Board since September 2023. According to the Company's public filings, Defendant Schenkein received $1,031,155 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Schenkein beneficially owned 2,526 shares of Regeneron common stock, worth roughly $2.25 million.

29.      Defendant George L. Sing ("Sing") has served as a member of the Board since 1988 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Sing received $724,987 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Sing beneficially owned 75,357 shares of Regeneron common stock, worth more than $67 million.

30.      Defendant Craig B. Thompson ("Thompson") has served as a member of the Board since 2022. According to the Company's public filings, Defendant Thompson received $247,785 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Thompson beneficially owned 4,792 shares of Regeneron common stock, worth roughly $4.2 million.

31.      Defendant George D. Yancopoulos ("Yancopoulos") has served as a member of the Board since 2001 and has served as Co-Chair of the Board alongside Defendant Schleifer since June 2023. Defendant Yancopoulos additionally serves as the Company Chief Scientific Officer. According to the Company's public filings, Defendant Yancopoulos received $7,759,830 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Yancopoulos beneficially owned 1,953,137 shares of Regeneron common stock, worth roughly $1.75 billion and constituting 1.5% of the Company's total outstanding stock.

32.     Defendant Huda Y. Zoghbi ("Zoghbi") has served as a member of the Board since 2016. According to the Company's public filings, Defendant Zoghbi received $714,987 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Zoghbi beneficially owned 28,298 shares of Regeneron common stock, worth more than $25 million.

***Officer Defendants***

33.     Defendant Christopher Fenimore ("Fenimore") has served as the Company's Chief Financial Officer ("CFO") since February 5, 2024. Defendant Fenimore is named is a defendant in the Securities Class Action.

34.     Defendant Robert R. Landry ("Landry") served as the Company's CFO from September 2013 until February 5, 2024. According to the Company's public filings, Defendant Landry received $1,904,476 in 2023 in compensation from the Company. As of April 16, 2024, Defendant Landry beneficially owned 86,714 shares of Regeneron common stock, worth roughly $77.5 million. Defendant Landry is named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers, directors, and/or fiduciaries of Regeneron and because of their ability to control the business and corporate affairs of Regeneron, the Individual Defendants owed Regeneron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

36.     The Individual Defendants were and are required to use their utmost ability to control and manage Regeneron in a fair, just, honest, and equitable manner.

37.     The Individual Defendants were and are required to act in furtherance of the best interests of Regeneron and its shareholders to benefit all shareholders equitably.

38.     Each director and officer of the Company owes Regeneron and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company.

39.     As fiduciaries of Regeneron, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

40.     The officers and directors of Regeneron were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

41.     Each Individual Defendant under their position as officers of Regeneron, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

42.     As Regeneron's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

43.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

44.     As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

9

45.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)      Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York, the United States, and pursuant to the Regeneron's Code of Business Conduct and Ethics (the "Code of Conduct") and internal guidelines;

b)      Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

c)      Remain informed as to how Regeneron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry and to take steps to correct such conditions or practices;

d)      Establish and maintain systematic, accurate records and reports of the business and internal affairs of Regeneron and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)      Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Regeneron's operations would comply with all laws and Regeneron's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f)      Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was

required by law to disseminate.

g)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)    Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.    Each of the Individual Defendants also bore a duty of loyalty to Regeneron and its shareholders, mandating the prioritizations of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

47.    During the pertinent times, the Individual Defendants served as agents for each other and for Regeneron, always operating within the parameters of their agency.

48.    The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Regeneron, were privy to detrimental, confidential information concerning the Company.

49.    Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Regeneron.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.    In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the

true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

52.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

53.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Regeneron, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

54.     Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

55.     At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Regeneron, and at all times operated within the course and scope of that agency.

## REGENERON'S CODE OF CONDUCT

56.     Regeneron's Code of Conduct begins with a message from Defendant Schleifer

which states the following:

> Integrity means a commitment to doing the right thing, as a Company and as individuals, and operating in a responsible and ethical manner, every day with all of our stakeholders. This may not always be easy. But in the long run, acting ethically and with integrity is essential to the safety of our patients and to our business success.

57.    The Code of Conduct applies to "all officers, directors, and personnel . . . of Regeneron" and "[v]iolations of the Code may result in corrective action, including disciplinary action, up to and including termination of employment, and, where appropriate, disclosure to governmental and regulatory authorities."

58.    With respect to "Regeneron's Compliance Program," the Code of Conduct states, in pertinent part, that:

> The effectiveness of Regeneron's Compliance Program begins with the support and public commitment of the Company's leadership. The members of the Company's Board of Directors, the Chief Executive Officer (CEO), and the members of [Regeneron's] senior leadership team are committed to governing and growing the Company through ethical and compliant business strategies.

59.    In a section titled "Our Marketplace Responsibilities," the Code of Conduct states, in pertinent part, that:

> We operate in a myriad of requirements around the world designed to protect patients and research subjects. There are also laws and regulations designed to assure taxpayer funds used to buy medicine are appropriately spent. We support these goals and are committed to operating our business with integrity and in compliance with local, state, federal, and international laws and regulations.

> * * *

> Regeneron's commitment to develop and manufacture safe and effective products and legally and ethically promote their benefits to patients and their providers requires full compliance with all laws and regulations governing research, development, manufacturing, and commercialization of its products.

60.    In a subsection titled "Responsible Pricing & Access," the Code of Conduct states,

in pertinent part, that "[w]e believe medicines are only useful if patients in need can access and afford them. We are committed to ensuring that our approach to pricing, as well as access and affordability of our medicines is ethical and legally compliance."

61.    With respect to "Proper Use of Company Assets," the Code of Conduct states that "[w]e are all responsible for protecting Company assets against loss, theft, or other misuse."

62.    In a subsection titled "Maintaining Books and Records," the Code of Conduct states, in pertinent part, that:

> Regeneron is committed to maintaining and supplying accurate books and records for all of our transaction and Company data. Our records serve as the basis for managing our business and are necessary for meeting critical obligations to our stakeholders, including patients, shareholders, customers, partners, employees, government agencies, and others with whom we do business.
>
> All of Regeneron's books, records, and accounts must completely and accurately reflect the true nature of our business transactions and Company data in reasonable detail. All transactions must be authorized and recorded in compliance with Regeneron policies and applicable laws in a timely manner. Falsifying records and entries or misrepresenting facts or information could violate the law and result in severe penalties.

63.    With respect to "Financial Integrity," the Code of Conduct states, in pertinent part, that:

> Regeneron has legal responsibilities to make complete, accurate, and timely disclosures in all reports and documents that we file with government agencies. Financial records include those that we report publicly, such as those contained in our U.S. Securities and Exchange Commission filings, but also other internal records that contain financial information and form the foundation for our public and other official disclosures.

64.    In a subsection titled "Media and External Communications," the Code of Conduct states, in pertinent part, that "[w]e provide accurate information to all of our stakeholders."

## REGENERON'S AUDIT COMMITTEE CHARTER

65.    Pursuant to Regeneron's Audit Committee Charter, the purpose of the Audit

Committee is to:

> [P]rovide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting and internal control and legal compliance functions of the Corporation, including, without limitation, (a) assisting the Board in its oversight function by monitoring (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the Corporation's independent auditors' qualifications and independence, and (iv) the performance of the Corporation's independent auditors and the Corporation's internal audit function, if applicable, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Corporation's annual proxy statement.

66.     With respect to "Oversight and Evaluation of Internal Audit," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- Evaluate the internal audit process for establishing the annual audit plan and the focus on risk;
- Evaluate the audit scope and role of internal audit;
- Consider and review with management:
    - (i) The planned scope of the internal audit plan;
    - (ii) The internal audit budget;
    - (iii) Significant findings and management's response including the timetable for implementation to correct weaknesses; and
    - (iv) Any difficulties encountered in the course of the internal audit such as restrictions on the scope of their work or access to information;

67.     In a subsection titled "Annual Audit and Quarterly Reviews," the Audit Committee Charter states that the Audit Committee shall be responsible for the following:

- Review and accept, if appropriate, the annual audit plan of the Corporation's independent auditors, including the scope of audit activities and all critical accounting policies and practices to be used, and monitor such plan's progress and results during the year;
- Confirm through private discussions with the Corporation's independent auditors and the Corporation's management that no management restrictions are being placed on the scope of the independent auditors' work and discuss any disagreement between the independent auditors and management;
- Review the results of the year-end audit of the Corporation, including any comments or recommendations of the Corporation's independent auditors;
- Review with management, the Corporation's independent auditors and, if applicable, the Chief Audit Executive, the following:
    - (i) The Corporation's annual audited financial statements and quarterly

financial statements, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and any major issues related thereto;

(ii) Critical accounting policies and such other accounting policies of the Corporation as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Corporation's financial statements, as well as any critical audit matters arising from the current period audit;

(iii) Major issues regarding accounting principles and financial statements, presentations, including (A) any significant changes in the Corporation's selection or application of accounting principles and (B) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the ramifications and effects of alternative generally accepted accounting principles methods on the Corporation's financial statements;

68.     With respect to the Company's internal controls, the Audit Committee Charter states that the Audit Committee shall:

Periodically review with the chief executive officer and chief financial officer and independent auditors, periodically, the following:

(i) Significant deficiencies in the design or operation of internal controls which could adversely affect the Corporation's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Corporation's independent auditors;

(ii) Fraud that involves management or other employees of the Corporation; and

(iii) Significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

69.     The Audit Committee Charter further states that the Audit Committee shall:

**(i)** Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures and disclosure procedures through inquiry and discussions with management of the Corporation and the Corporation's independent auditors;

**(ii)** Review the yearly report prepared by management assessing the effectiveness of the Corporation's internal control structure and procedures for financial reporting and stating management's responsibility to establish and maintain such structure and procedures, prior to its inclusion in the Corporation's annual report;

    **(iii)** Review with management the Corporation's administrative, operational and accounting internal controls, including controls and security of the computerized information systems and any special audit steps adopted in light of material control deficiencies, and evaluate whether the Corporation is operating in accordance with its prescribed policies, procedures and codes of conduct;

    **(iv)** Review with management and the independent auditors any significant deficiencies and material weaknesses, as defined by the Public Company Accounting Oversight Board, affecting internal control

70. With respect to legal and regulatory compliance, the Audit Committee Charter states that the Audit Committee shall "[m]eet annually with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Corporation."

71. Finally, with respect to risk assessment, the Audit Committee Charter states that the Audit Committee shall "[d]iscuss with management the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures."

## SUBSTANTIVE ALLEGATIONS

*Background*

72. Regeneron is a biotechnology company that offers products designed for the treatment of, *inter alia,* eye disease, allergic and inflammatory diseases, cardiovascular disease, and cancer. One of the Company's core products is Eylea, an injection used to treat age-related macular degeneration.

73. Eylea works by inhibiting anti-VEGF. In November 2011, the FDA approved Eylea for use as an anti-VEGF inhibitor for age-related macular degeneration. In August 2023, the Company secured FDA approval for Eylea HD, a high-dose version of Eylea.

74. The Company derives substantial revenue from sales of Eylea and Eylea HD, which are largely dependent on the availability of reimbursements from third-party payors like Medicare

17

and Medicaid.

75.    The reimbursement rates for the Company's sales of Eylea and Eylea HD are based on the ASP that the Company reports to Centers for Medicare and Medicaid Services.

***False and Misleading Statements***

76.    On November 2, 2023, the Company issued a press release, reporting its third quarter 2023 financial results. The press release reported third quarter 2023 revenues of $3.36 billion, a 15% increase year-over-year, which included $1.49 billion in U.S. net sales for Eylea and Eylea HD. Specifically, the press release reported the following financial results:

> *Third quarter 2023 revenues increased 15% to $3.36 billion versus third quarter 2022*

> \* \* \*

> *Third quarter 2023 U.S. net sales for EYLEA® and EYLEA HD were $1.49 billion, including $43 million from EYLEA HD*

> \* \* \*

> *Third quarter 2023 GAAP diluted EPS of $8.89 and non-GAAP diluted EPS(a) of $11.59; includes unfavorable $0.77 impact from acquired IPR&D charge*

> \* \* \*

| ($ in millions, except per share data) | Q3 2023 | | Q3 2022 | | % Change |
|---|---|---|---|---|---|
| Total revenues | $ | 3,363 | $ | 2,936 | 15 % |
| GAAP net income | $ | 1,008 | $ | 1,316 | (23 %) |
| GAAP net income per share - diluted | $ | 8.89 | $ | 11.66 | (24 %) |
| Non-GAAP net income(a) | $ | 1,329 | $ | 1,270 | 5 % |
| Non-GAAP net income per share - diluted(a) | $ | 11.59 | $ | 11.14 | 4 % |

> \* \* \*

| ($ in millions) | Q3 2023 | Q3 2022 | % Change |
|---|---|---|---|
| Net product sales: | | | |
| EYLEA - U.S. | $ 1,448 | $ 1,629 | (11 %) |
| EYLEA HD - U.S. | 43 | — | * |
| Libtayo - Global** | 232 | 126 | 84 % |
| Praluent® - U.S. | 40 | 30 | 33 % |
| Evkeeza® - U.S. | 19 | 13 | 46 % |
| Inmazeb® - U.S. | 4 | 3 | 33 % |
| Total net product sales | 1,786 | 1,801 | (1 %) |
| Collaboration revenue: | | | |
| Sanofi | 1,065 | 711 | 50 % |
| Bayer | 377 | 333 | 13 % |
| Other | (3) | 6 | * |
| Other revenue | 138 | 85 | 62 % |
| Total revenues | $ 3,363 | $ 2,936 | 15 % |

77.     On November 2, 2023, Regeneron filed a quarterly report on Form 10-Q with the SEC for its third quarter of 2023 (the "3Q23 10-Q"), which repeated the Company's previously reported financial results. The 3Q23 10-Q included a misleading risk disclosure which represented as merely hypothetical risks associated with liability for violations of the False Claims Act:

> ***Our business activities have been, and may in the future be, challenged under U.S. federal or state and foreign healthcare laws, which may subject us to civil or criminal proceedings, investigations, or penalties.[2]***
>
> * * *
>
> In addition to FDA and related regulatory requirements, we are subject to health care "fraud and abuse" laws, such as the federal civil False Claims Act, the anti-kickback provisions of the federal Social Security Act, and other state and federal laws and regulations.
>
> * * *
>
> The federal civil False Claims Act prohibits any person from, among other things, knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid.
>
> * * *
>
> ***Pharmaceutical companies have been investigated and/or prosecuted under these laws for a variety of alleged promotional and marketing activities, such as allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product; reporting to pricing***

---

[2] Unless indicated otherwise, all emphasis is added.

*services inflated average wholesale prices that were then used by federal programs to set reimbursement rates; engaging in promotion for uses that the FDA has not approved, known as off-label uses, that caused claims to be submitted to Medicaid for non-covered off-label uses; and submitting inflated best price information to the Medicaid Rebate program.*

\* \* \*

We continue to dedicate significant resources to comply with these requirements and need to be prepared to comply with additional reporting obligations outside the United States.

\* \* \*

If we are found not to be in full compliance with these laws, we could face enforcement actions, fines, and other penalties, and could receive adverse publicity, which would harm our business, prospects, operating results, and financial condition. Additionally, access to such data by fraud-and-abuse investigators and industry critics may draw scrutiny to our collaborations with reported entities.

78.    The 3Q23 10-Q additionally included the following misleading risk disclosure related to noncompliance with reporting obligations under governmental pricing and reimbursement programs:

*If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations, and future prospects.*

\* \* \*

We have obligations to report the average sales price for certain of our drugs to the Medicare program. Statutory or regulatory changes or CMS guidance could affect the average sales price calculations for our products and the resulting Medicare payment rate, and could negatively impact our results of operations.

Starting in 2023, manufacturers must pay refunds to Medicare for single-source drugs or biological products, or biosimilar biological products, reimbursed under Medicare Part B and packaged in single-dose containers or single-use packages for units of discarded drug reimbursed by Medicare Part B in excess of 10 percent of total allowed charges under Medicare Part B for that drug. Manufacturers that fail to pay refunds could be subject to civil monetary penalties of 125 percent of the refund amount.

Pursuant to applicable law, knowing provision of false information in connection with price reporting or contract-based requirements under the VA/FSS and/or Tricare programs can subject a manufacturer to civil monetary penalties. These program and contract-based obligations also contain extensive disclosure and certification requirements. If we overcharge the government in connection with our arrangements with FSS or Tricare, we are required to refund the difference to the government. Failure to make necessary disclosures or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and/or response to a government investigation or enforcement action, would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations, and future prospects.

79.    On January 8, 2024, Defendant Schleifer participated at the 42nd Annual J.P. Morgan Healthcare Conference on behalf of Regeneron. During his presentation, Defendant Schleifer reported the following preliminary fourth quarter 2023 results for Eylea and Eylea HD:



80.    On February 2, 2024, Regeneron issued a press release, reporting the following fourth quarter and full year 2023 financial results:

21

*Fourth quarter 2023 revenues increased 1% to $3.43 billion versus fourth quarter 2022; excluding Ronapreve™(a)(b), revenues increased 14%*

*Full year 2023 revenues increased 8% to $13.12 billion versus full year 2022; excluding Ronapreve(a), revenues increased 12%*

\* \* \*

*Fourth quarter 2023 U.S. net sales for EYLEA® HD and EYLEA® were $1.46 billion, including $123 million from EYLEA HD; full year 2023 U.S. net sales for EYLEA HD and EYLEA were $5.89 billion, including $166 million from EYLEA HD following its August 2023 FDA approval*

\* \* \*

| ($ in millions, except per share data) | Three Months Ended December 31, | | | Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | % Change | 2023 | 2022 | % Change |
| Total revenues | $ 3,434 | $ 3,414 | 1 % | $ 13,117 | $ 12,173 | 8 % |
| Total revenues excluding Ronapreve[(a)(b)] | $ 3,436 | $ 3,018 | 14% | $ 12,906 | $ 11,546 | 12% |
| GAAP net income | $ 1,160 | $ 1,197 | (3 %) | $ 3,954 | $ 4,338 | (9 %) |
| GAAP net income per share - diluted | $ 10.19 | $ 10.50 | (3 %) | $ 34.77 | $ 38.22 | (9 %) |
| Non-GAAP net income[(a)] | $ 1,366 | $ 1,449 | (6 %) | $ 5,045 | $ 5,164 | (2 %) |
| Non-GAAP net income per share - diluted[(a)] | $ 11.86 | $ 12.56 | (6 %) | $ 43.79 | $ 44.98 | (3 %) |

\* \* \*

| ($ in millions) | Q4 2023 | Q4 2022 | % Change | FY 2023 | FY 2022 | % Change |
|---|---|---|---|---|---|---|
| Net product sales: | | | | | | |
| EYLEA HD - U.S. | $ 123 | $ — | * | $ 166 | $ — | * |
| EYLEA - U.S. | 1,338 | 1,496 | (11 %) | 5,720 | 6,265 | (9 %) |
| Total EYLEA HD and EYLEA - U.S. | 1,461 | 1,496 | (2 %) | 5,886 | 6,265 | (6 %) |
| Libtayo - Global** | 244 | 152 | 61 % | 863 | 448 | 93 % |
| Praluent® - U.S. | 61 | 36 | 69 % | 182 | 130 | 40 % |
| Evkeeza® - U.S. | 24 | 15 | 60 % | 77 | 48 | 60 % |
| Inmazeb™ - U.S. | 62 | — | * | 70 | 3 | * |
| Total net product sales | 1,852 | 1,699 | 9 % | 7,078 | 6,894 | 3 % |
| Collaboration revenue: | | | | | | |
| Sanofi | 993 | 836 | 19 % | 3,800 | 2,856 | 33 % |
| Bayer | 377 | 355 | 6 % | 1,487 | 1,431 | 4 % |
| Other | — | 396 | (100 %) | 216 | 627 | (66 %) |
| Other revenue | 212 | 128 | 66 % | 536 | 365 | 47 % |
| Total revenues | $ 3,434 | $ 3,414 | 1 % | $ 13,117 | $ 12,173 | 8 % |

81.    On February 5, 2024, Regeneron filed its 2023 annual report on Form 10-K with the SEC, which repeated the Company's previously reported financial results (the "2023 10-K").

82.    The 2023 10-K repeated substantially the same risk disclosures related to noncompliance with the False Claims Act and with reporting obligations under governmental pricing and reimbursement programs that were contained in the 3Q23 10-Q.

83.    The statements identified above were materially false and misleading and omitted

to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company paid credit card fees to distributors in exchange for distributors' agreement not to charge Eylea customers extra for use of a credit card; (ii) these payments constituted a subsidy for customer purchases of Eylea which lowered the price of the product; (iii) by failing to report these payments, the Company overstated its ASP in reports to federal agencies in violation of the False Claims Act; and (iv) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

***The Truth Gradually Emerges***

84.    The truth began to emerge on April 10, 2024, when the DOJ announced that it had filed a complaint against the Company for violations of the False Claims Act. According to the DOJ complaint, the Company inflated the ASP that it reported for Eylea by failing to report millions of dollars in subsidies provided to drug distributors in the form of reimbursed credit card fees. Specifically, the DOJ alleged:

> Regeneron knew that distributors incurred processing fees if retina practices used credit cards to purchase expensive drugs like Eylea, and that, accordingly, distributors would charge retina practices a higher amount to use credit cards for Eylea purchases, unless Regeneron reimbursed those fees. Regeneron also knew that most customers wanted to use credit cards for their expensive drug purchases, in part because of the lucrative cash back rewards. ***Regeneron thus agreed to, and did pay, the credit card processing fees for retina practices' Eylea purchases.***

* * *

> An unwritten, but well-understood and followed, component of Regeneron's agreements with distributors was that Regeneron paid credit card processing fees for customers' Eylea purchases on the condition that the distributors did not charge Eylea customers more to use a credit card—which Regeneron knew they otherwise would in the absence of Regeneron's payments.

* * *

23

***Before and after Eylea's launch, Regeneron understood the competitive nature of the Wet AMD market, including that retina practices were sensitive to the higher prices they faced when they used credit cards to purchase Anti-VEGF medications.*** In July 2011, a Regeneron "Reimbursement Business Manager" sent an internal email describing this dynamic and noting that it was a "big deal" for certain customers to be able to use credit cards without incurring an additional expense: "Lucentis [D]irect does not charge the providers any more for paying with a credit card, however ***the distributors (Besse) do charge more for a credit card payment. This also was a big deal for several accounts.***" Ex. 28 (emphasis added). Robert Davis, then Regeneron's Senior Director of Trade, Reimbursement and Managed Markets, responded "Good feedback and pretty consistent . . . . ***We will pay pass thru fees so the 3 distributors [(Besse, McKesson, and CuraScript)] will not charge extra to offices." Id.*** (emphasis added).

Regeneron marketed to customers that they could use credit cards to purchase Eylea from distributors without paying more—and that customers could not do so for Lucentis— as a "Key Takeaway" in its messaging:

## Key Takeaways:

- EYLEA is contracted with three distributors
- Credit cards are accepted by all 3 distributors and <u>not</u> for Lucentis orders

\* \* \*

***Thus, Regeneron's reimbursement of credit card fees was functionally no different than if Regeneron or distributors directly paid customers to cover the higher costs they would otherwise have incurred, or if distributors credited customers for those amounts on their invoices, based on Regeneron's payments.*** Regeneron knew its payments were passed on to customers in two ways: (1) the lower, subsidized prices customers paid when they used credit cards to purchase Eylea from distributors, and (2) the "cash back" and credit card rewards Eylea customers received from those purchases

\* \* \*

***By purporting not to offer price concessions on Eylea, Regeneron could market Eylea's stable ASP (and stable reimbursement) as a competitive advantage for retina practices when compared to Lucentis***.

\* \* \*

*Regeneron knew that its payment of credit card processing fees on behalf of customers was a price concession for many customers, and because Regeneron did not report them as price concessions, had the further benefit of not eroding Eylea's ASP*.

85.    On this news, the price of Regeneron stock declined 3.36% over the following two days, closing at $904.70 per share on April 12, 2024.

86.    Despite this partially corrective disclosure, the price of Regeneron stock remained artificially inflated as the Individual Defendants continued to issue materially false and misleading statements.

87.    On April 25, 2024, Regeneron filed a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Coles, Guarini, Ryan, Sing, and Schenkein to the Board and the compensation of certain of the Company's executive officers, including Defendants Schleifer, Yancopoulos, and Landry.

88.    The 2024 Proxy represented that, during 2023, the Company's "medicines reached more people than ever before, in part [due to Regeneron] *remaining committed to fair pricing principles.*"

89.    With respect to the Board's oversight over the Company's pricing decisions, the 2024 Proxy stated that the Board "consider specific risk topics, including risks associated with [Regeneron's] strategic plan, drug access and pricing" and that the Board "provides oversight of all key pricing determination for [Regeneron's] products."

90.    With respect to the Company's internal controls, the 2024 Proxy represented that the Audit Committee of the Board "[r]eview[s] and discuss[es] the adequacy and effectiveness of the Company's accounting and internal control policies and procedures."

91.    The statements in the 2024 Proxy were materially false and misleading because, as

alleged herein, the Company was not "committed to fair pricing principles" but was instead overbilling Medicare and Medicaid by overstating the ASP of Eylea and Eylea HD, in violation of the False Claims Act. Further, despite the description of the Board's and its committees' oversight responsibilities with respect to risk management and internal controls, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

92.    On May 2, 2024, Regeneron issued a press release, reporting the following first quarter 2024 financial results:

*First quarter 2024 revenues decreased 1% to $3.15 billion versus first quarter 2023; excluding Ronapreve™[], **revenues increased 7%***

\* \* \*

**First quarter 2024 U.S. net sales for EYLEA® HD and EYLEA® were $1.40 billion, including $200 million from EYLEA HD**

\* \* \*

*First quarter 2024 GAAP diluted EPS of $6.27 and non-GAAP diluted EPS(a) of $9.55*

\* \* \*

| ($ in millions, except per share data) | Q1 2024 | Q1 2023 | % Change |
|---|---|---|---|
| Total revenues | $ 3,145 | $ 3,162 | (1 %) |
| Total revenues excluding Ronapreve(a)(b) | $ 3,145 | $ 2,940 | 7 % |
| GAAP net income | $ 722 | $ 818 | (12 %) |
| GAAP net income per share - diluted | $ 6.27 | $ 7.17 | (13 %) |
| Non-GAAP net income(a) | $ 1,116 | $ 1,168 | (4 %) |
| Non-GAAP net income per share - diluted(a) | $ 9.55 | $ 10.09 | (5 %) |

\* \* \*

| ($ in millions) | Q1 2024 | Q1 2023 | % Change |
|---|---|---|---|
| Net product sales: | | | |
| EYLEA HD - U.S. | $      200 | $        — | * |
| EYLEA - U.S. | 1,202 | 1,434 | (16 %) |
| Total EYLEA HD and EYLEA - U.S. | 1,402 | 1,434 | (2 %) |
| Libtayo - Global | 264 | 177 | 49 % |
| Praluent - U.S. | 70 | 40 | 75 % |
| Evkeeza® - U.S. | 24 | 15 | 60 % |
| Inmazeb® - Global | 1 | 2 | * |
| Total net product sales | 1,761 | 1,668 | 6 % |
| Collaboration revenue: | | | |
| Sanofi | 910 | 798 | 14 % |
| Bayer | 356 | 357 | — % |
| Other | 1 | 223 | (100 %) |
| Other revenue | 117 | 116 | 1 % |
| Total revenues | $   3,145 | $   3,162 | (1 %) |

93.     On May 2, 2024, Regeneron filed a quarterly report on Form 10-Q for the first fiscal quarter of 2024 (the "1Q24 10-Q"). The 1Q24 10-Q included substantially the same misleading risk disclosure regarding noncompliance with the False Claims Act that was contained in the 3Q23 10-Q and the 2023 10-K. The 1Q24 10-Q further included the following risk disclosure regarding noncompliance with the Company's reporting and payment obligations:

*If we fail to comply with our reporting and payment obligations under the Medicaid Drug Rebate program or other governmental pricing programs, we could be subject to additional reimbursement requirements, penalties, sanctions and fines, which could have a material adverse effect on our business, financial condition, results of operations, and future prospects.*

* * *

We have obligations to report the average sales price for certain of our drugs to the Medicare program. Statutory or regulatory changes or CMS guidance could affect the average sales price calculations for our products and the resulting Medicare payment rate, and could negatively impact our results of operations.

Pursuant to applicable law, knowing provision of false information in connection with price reporting or contract-based requirements under the VA/FSS and/or Tricare programs can subject a manufacturer to civil monetary penalties. These program and contract-based obligations also contain extensive disclosure and certification requirements. If we overcharge the government in connection with our

27

arrangements with FSS or Tricare, we are required to refund the difference to the government. Failure to make necessary disclosures or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and/or response to a government investigation or enforcement action, would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations, and future prospects.

94.     On August 1, 2024, the Company issued a press release, reporting the following second quarter 2024 financial results:

***Second quarter 2024 revenues increased 12% to $3.55 billion versus second quarter 2023***

\* \* \*

***Second quarter 2024 U.S. net sales for EYLEA® HD and EYLEA® increased 2% to $1.53 billion versus second quarter 2023, including $304 million from EYLEA HD***

\* \* \*

*Second quarter 2024 GAAP diluted EPS increased 46% to $12.41 and non-GAAP diluted EPS(a) increased 13% to $11.56 versus second quarter 2023*

\* \* \*

| ($ in millions, except per share data) | Q2 2024 | Q2 2023 | % Change |
|---|---|---|---|
| Total revenues | $ 3,547 | $ 3,158 | 12 % |
| GAAP net income | $ 1,432 | $ 968 | 48 % |
| GAAP net income per share - diluted | $ 12.41 | $ 8.50 | 46 % |
| Non-GAAP net income(a) | $ 1,351 | $ 1,182 | 14 % |
| Non-GAAP net income per share - diluted(a) | $ 11.56 | $ 10.24 | 13 % |

\* \* \*

28

| ($ in millions) | Q2 2024 | Q2 2023 | % Change |
|---|---|---|---|
| Net product sales: | | | |
| EYLEA HD - U.S. | $ 304 | $ — | * |
| EYLEA - U.S. | 1,231 | 1,500 | (18 %) |
| Total EYLEA HD and EYLEA - U.S. | 1,535 | 1,500 | 2 % |
| Libtayo - Global | 297 | 210 | 41 % |
| Praluent - U.S. | 56 | 41 | 37 % |
| Evkeeza® - U.S. | 31 | 19 | 63 % |
| Inmazeb® - Global | — | 2 | (100 %) |
| Total net product sales | 1,919 | 1,772 | 8 % |
| Collaboration revenue: | | | |
| Sanofi | 1,146 | 944 | 21 % |
| Bayer | 375 | 377 | (1 %) |
| Other | 3 | (4) | * |
| Other revenue | 104 | 69 | 51 % |
| Total revenues | $ 3,547 | $ 3,158 | 12 % |

95.    On August 1, 2024, Regeneron filed a quarterly report on Form 10-Q with the SEC for its second fiscal quarter of 2024 (the "2Q24 10-Q"). The 2Q24 10-Q repeated substantially the same misleading risk disclosures regarding noncompliance with the False Claims Act and with reporting obligations under governmental pricing and reimbursement programs that were contained in the 1Q24 10-Q.

***The Full Truth Emerges***

96.    On October 31, 2024, the Company issued a press release, reporting the following third quarter 2024 financial results:

*Third quarter 2024 U.S. net sales for EYLEA HD® and EYLEA® increased 3% versus third quarter 2023 to $1.54 billion, including $392 million from EYLEA HD*

\* \* \*

| ($ in millions) | Q3 2024 | | Q3 2023 | | % Change |
|---|---|---|---|---|---|
| Net product sales: | | | | | |
| EYLEA HD - U.S. | $ | 392 | $ | 43 | * |
| EYLEA - U.S. | | 1,145 | | 1,448 | (21 %) |
| Total EYLEA HD and EYLEA - U.S. | | 1,537 | | 1,491 | 3 % |
| Libtayo - Global | | 289 | | 232 | 25 % |
| Praluent® - U.S. | | 53 | | 40 | 33 % |
| Evkeeza® - U.S. | | 32 | | 19 | 68 % |
| Inmazeb® - Global | | 35 | | 4 | * |
| Total net product sales | | 1,946 | | 1,786 | 9 % |
| Collaboration revenue: | | | | | |
| Sanofi | | 1,263 | | 1,065 | 19 % |
| Bayer | | 391 | | 377 | 4 % |
| Other | | 6 | | (3) | * |
| Other revenue | | 114 | | 138 | (17 %) |
| Total revenues | $ | 3,720 | $ | 3,363 | 11 % |

Total EYLEA HD and EYLEA net product sales in the U.S. increased 3% in the third quarter of 2024 compared to the third quarter of 2023. EYLEA HD was approved by the FDA in August 2023 and net product sales in the third quarter of 2024 were driven by the transition of patients from other anti-VEGF products, including EYLEA, as well as new patients naïve to anti-VEGF therapy. ***Net product sales of EYLEA in the third quarter of 2024 were adversely impacted by a lower net selling price compared to the third quarter of 2023.*** In addition, third quarter 2024 total EYLEA HD and EYLEA net product sales were favorably impacted by approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD at the end of the third quarter of 2024 compared to the end of the second quarter of 2024, partially offset by lower wholesaler inventory levels for EYLEA.

97.     On this news, the price of Regeneron stock declined 9.2% in one day, closing at $838.20 per share on October 31, 2024.

## DAMAGE TO REGENERON

98.     As a direct and proximate result of the Individual Defendants' misconduct, Regeneron has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

99.     Such expenditures include, but are not limited to, legal fees associated with defending against the DOJ complaint and the Securities Class Action and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

100.    These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

101.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

102.    As a direct and proximate result of the Individual Defendants' actions, Regeneron has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

104.    Regeneron is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

105.    Plaintiff is current shareholders of Regeneron and was continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

106.    At the time this action was commenced, the thirteen-member Board was comprised of Defendants Schleifer, Yancopoulos, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Ryan, Schenkein, Sing, Thompson, and Zoghbi. Accordingly, Plaintiff is only required to show that seven Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

107.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

108.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

109.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Regeneron, the Individual Defendants knew, or should have known, the material facts surrounding Regeneron's sales incentive plan and the material deficiencies in the Company's internal controls over financial reporting.

110.    Defendant Schleifer is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

111.    Defendants Sing, Coles, Guarini, and Ryan serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements and internal controls over financial reporting. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding Regeneron's illegal pricing practices and the adequacy of the Company's internal controls over financial reporting as alleged above. Therefore, Defendants Sing, Coles, Guarini, and Ryan cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

112.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These

conflicts of interest have precluded the current directors from calling into question the other Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein. For instance, none of the Individual Defendants have sought to enforce Regeneron's Misconduct Recoupment Policy which provides for "recoupment or reduction [] of incentive compensation awarded to our officers and other specified employees for compliance violations, which applies to bonus and other incentive compensation regardless of whether paid or payable in cash, equity, or otherwise and regardless of whether such compensation has been earned or vested."

113.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Regeneron. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Regeneron, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

114.     If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Regeneron to sue the Defendants named herein, since, if they did, they

would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

115.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## CLAIMS FOR RELIEF

### COUNT I
**Against the Individual Defendants for Violations of § 14(a) of the Exchange Act and Rule 14a-9**

116.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

117.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

118.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in 2024 Proxy. As alleged above, the 2024 Proxy contained materially false and misleading statements concerning the Company's illegal pricing practices and the adequacy of the Company's internal controls over financial reporting.

119.    The 2024 Proxy was used to solicit shareholder votes in connection with the re-election of Defendants Coles, Guarini, Ryan, Sing, and Schenkein to the Board.

120.    The 2024 Proxy was also used to solicit the compensation of certain of the Company's executive officers including Defendants Schleifer, Yancopoulos, and Landry. While the shareholder vote on compensation was non-binding, the 2024 Proxy indicated that the "board of directors and the Compensation Committee value [shareholder] opinion and will review and

consider the voting results in connection with their ongoing evaluation of [Regeneron's] compensation program."

121.    Describing the Company's "Compensation Program Objectives," the 2024 Proxy indicated that compensation is performance-based, stating that "Regeneron's executive compensation program is designed to pay for performance" and that the Company "[p]rovide[s] at-risk, performance based equity to all employees."

122.    The materially false and misleading statements contained in the 2024 Proxy regarding the Company's illegal pricing practices and the adequacy of the Company's internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the election of Defendants Coles, Guarini, Ryan, Sing, and Schenkein and performance-based compensation to Defendants Schleifer, Yancopoulos, and Landry, to which they were not entitled.

123.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

<u>**COUNT II**</u>
**Against the Individual Defendants**
**For Breach of Fiduciary Duties**

124.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

125.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Regeneron's business and affairs.

126.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants

intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Regeneron's shareholders.

127.    In breach of their fiduciary duties owed to Regeneron, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

128.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Regeneron's securities.

129.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

130.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Regeneron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

131.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

**<u>COUNT III</u>**
**Against the Individual Defendants**
**For Aiding and Abetting Breach of Fiduciary Duty**

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

134.     Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants
### For Unjust Enrichment

135.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Regeneron.

137.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Regeneron that were tied to the performance or artificially inflated valuation of Regeneron, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

138.     Plaintiff, as a shareholder and representative of Regeneron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

139.     Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## COUNT V

**Waste of Corporate Assets
Against the Individual Defendants**

140.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Regeneron to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

142.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

143.    Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)    Declaring that the Plaintiff may maintain this action on behalf of Regeneron and that Plaintiff is an adequate representative of the Company;

b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Regeneron;

c)    Determining and awarding to Regeneron the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve Regeneron's corporate governance and internal procedures to comply with applicable laws and to protect Regeneron and its shareholders from a repeat of the damaging events described herein;

e)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 16, 2025                              **RIGRODSKY LAW, P.A.**

                                                    By: */s/ Timothy J. MacFall*
                                                    Timothy J. MacFall
                                                    Samir Aougab
                                                    825 East Gate Boulevard, Suite 300
                                                    Garden City, NY 11530
                                                    Telephone: (516) 683-3516
                                                    Facsimile: (302) 654-7530
                                                    tjm@rl-legal.com
                                                    sa@rl-legal.com

                                                    *Counsel for Plaintiff*